DEBORAH M. SMITH
Acting United States Attorney

Eve C. Zamora
Special Assistance U. S. Attorney
101 12th Avenue, Room 310
Fairbanks, Alaska 99701
Telephone: (907) 353-6561-6510
Fax: (907) 353-6501
MN Bar: 0297859

Attorneys for the Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 4:06-cr-00023-RRB-1 |
| Plaintiff, | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND FOR AN EVIDENTIARY HEARING |
| vs. | |
| ADAM M. SNIEGOWSKI | |
| Defendant. | |

## INTRODUCTION

Plaintiff, United States of America, submits this memorandum of law in opposition to Defendant, Adam M. Sniegowski's ("Defendant") motion to suppress evidence and statements in the above entitled case. It is not clear what evidence and statements the Defendant wishes to suppress as the events leading up to the Defendant being taken into custody are wholly separate from the event that initiated the arrest. As set forth below, Defendant has failed to make an offer of proof and his request for hearing should be denied.

## FACTS

On 24 September 2005, at approximately 0330 hours, a fight broke out between several people in the parking lot in front of the Arctic Oasis Club on Fort Wainwright, Alaska. (Zamora Aff. ¶ 2, Ex. 1) Upon arriving at the scene, military police officer, Sergeant Gregory Templeton ("SGT Templeton") encountered the Defendant who appeared to be quite agitated and was disrupting the military police officers while they ascertained the facts surrounding the fight. (Id.) The Defendant was running around the parking lot yelling at the military police and demanding they not take anyone to jail. (Id.) SGT Templeton attempted to calm the Defendant and asked him what he had seen. (Id.) The Defendant continued to be verbally abusive and physically aggressive toward SGT Templeton by getting in his "face" and telling him to "shut the fuck up and leave." (Id.) Upon witnessing the Defendant's physically aggressive stance toward SGT Templeton, Private First Class Patricia Peterson ("PFC Peterson") momentarily displayed a can of pepper spray. (Id.)

Due to the number of the crowd that had gathered, the location and time, SGT Templeton asked that everyone go the MP Station so that information could be gathered in a safer environment. (Id.) The Defendant agreed to go to the MP Station and got a ride with friends to that location. (Id.)

Upon arriving at the MP Station, the Defendant gave SGT Templeton his driver's license, but then refused to give any information regarding the fight and requested to leave. (Zamora Aff. ¶¶ 2 -3, Exs. 1 and 2) The Defendant's driver's license was returned to him and he was allowed to leave. (Zamora Aff. ¶ 2, Ex 1) After being released, the Defendant left through the rear building exit and then reentered the building through the

2

front entrance and into the waiting room where others were waiting to make statements regarding the fight. (Zamora Aff. ¶ 3, Ex. 2) The Defendant began to compromise the investigation by telling the other witnesses not to make statements and to change their names. (Id.) At that point, the Desk Sergeant, Staff Sergeant Erik Miller ("SSG Miller") told the Defendant to leave the MP Station. (Id.) The Defendant refused to leave and stated that he did not have a ride. (Zamora Aff. ¶ 2, Ex. 1)

After continuing to be disruptive to the investigation, verbally abusive to the military police officers, and refusing to leave the MP Station after being asked to do so several times, the Defendant assumed a fighting stance, raising his fist appearing to ready himself for an attack upon SSG Miller. (Zamora Aff. ¶ 3, Ex. 2) SSG Miller determined the Defendant's refusal to leave the premises combined with his assaultive behavior constituted Disorderly Conduct in violation of Alaska Stat. § 11.61.110 as assimilated under 18 U.S.C. § 13. (Id.) The Defendant was then apprehended. (Id.) During the apprehension, the Defendant fought the arresting officers, injuring SGT Templeton when he pushed him into a magazine rack. (Id.) The Defendant was then processed and released. (Id.)

## LEGAL ANALYSIS

The Defendant fails to present any disputed facts that require an evidentiary hearing. The Defendant makes the erroneous and factually unsupported argument that all statements and evidence should be suppressed because he was seized without reasonable suspicion or in the alternate arrested without probable cause in violation of his Fourth Amendment rights. (Zamora Aff. ¶ 4, Ex. 3 pp. 4 – 6) The Defendant was never illegally

detained, nor placed into de facto custody prior to his disorderly conduct at the MP Station.

I.  **An evidentiary hearing would be improper because he has failed to present any disputed facts that require a hearing.**

The Defendant's motion to suppress does not raise any "contested issues of fact" that would require an evidentiary hearing. The Ninth Circuit has held that evidentiary hearings on motions to suppress are only required if the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist. United States v. Ramirez-Garcia, 269 F.3d 945, 947 (9th Cir. 2001); United States v. Wilson, 7 F.3d 828, 834 (9th Cir. 1993) (an evidentiary hearing is not required on a motion to suppress if the grounds for suppression consist solely of conclusory allegations of illegality).

The Defendant has not identified any fact issue requiring the Court to take evidence; nor, has he offered any affidavit or even the scantiest evidence to support his assertion that "all evidence and statements" should be suppressed. He even fails to plead with specificity as to what exactly he wants suppressed and why. The Defendant is simply conducting a fishing expedition.

The Defendant has failed to meet his burden and his request for an evidentiary hearing should be denied.

II. **The Defendant was not unconstitutionally detained or seized.**

The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by

4

enforcement officials with the privacy and personal security of individuals." United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976).

> "Not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19, n.16 (1968).

The interaction between the Defendant and the military police did not rise to the level of a seizer. SGT Templeton responded to the Arctic Oasis parking lot to investigate a reported fight. (Zamora Aff. ¶ 2, Ex. 1) Upon arriving at the scene, SGT Templeton encountered the Defendant and simply asked him what he had seen regarding the fight that had taken place. (Id.) He was not detained or prevented from leaving the parking lot neither by physical force or otherwise. This is the type of necessary police-citizen interaction the Terry and Martinez-Fuerte Courts determined does not rise to the level of a seizure.

> "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." United States v. Mendenhall 446 U.S. 544, 555 (1980), citing Terry supra.

A look at the circumstances surrounding the Defendant's interactions with the military police show that a reasonable person in the Defendant's position would not have believed that he was not free to leave. The military police responded to the parking lot of a bar at closing time when it was full of people. (Zamora Aff. ¶ 2, Ex. 1) SGT

Templeton encounters the Defendant and asks him what happened. (Id.) The Defendant responds by telling him to "shut the fuck up." SGT Templeton continues to talk to the Defendant in an effort to calm him down and learn if he has helpful information regarding the fight. (Id.) None of the military police in anyway tried to keep the Defendant at the scene. In fact, the Defendant ordered the military police to leave "shut the fuck up and leave." (Id.)

Defendant contends that he was "ordered" to the MP Station constituting a seizure absent reasonable suspicion that he had committed criminal activity. (Zamora Aff. ¶ 4, Ex. 3 p. 4) "A person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." Mendenhall *supra* at 553 – 554.

The Defendant's movement was not restrained at any time during his interaction with the military police in the Arctic Oasis parking lot. Only when it appeared that he was becoming physically threatening did one of the officers take out her pepper spray in response to the Defendant's aggressive actions. (Zamora Aff. ¶ 2, Ex. 1) Even that slight show of force was fleeting at best.

SGT Templeton asked him, as well as, other witnesses to go to the MP Station to give information about the fight that had occurred. (Id.) This request did not constitute seizure. The Defendant was not "ordered" to the MP Station. He was asked to go. (Id.) He was not escorted or placed in a police vehicle and transported. (Id.) He rode to the station with friends in a privately owned vehicle. (Id.) He gave his driver's license to the military police *after* he arrived at the MP Station so that information forms could be

completed. His driver's license was returned to him immediately when he stated that he wanted to leave. (Id.) At no time was his freedom of movement in anyway restrained; nor, would a reasonable person in his position believe that he was not free to leave. Thus, there was not a seizure contemplated by the above cited cases decided by the United States Supreme Court; nor, by the numerous courts that have ruled on this very issue over the course of many decades. The case law simply does not support the Defendant's assertion that he was unconstitutionally detained.

Even if the Court finds the Defendant was unconstitutionally detained, that detention ended when he was released. The Defendant told SGT Templeton at the MP Station that he wanted to leave. At that point, his driver's license was returned and he was released immediately. (Zamora Aff. ¶ 3, Ex. 2) This departure ended the Defendant's initial encounter with the military police. When the Defendant later returned to the MP Station on his own accord, he started an entirely new and separate chain of events.

**III.    The Defendant's arrest was supported by probable cause.**

It appears the Defendant is asserting that when he was asked to go to the MP Station he was placed in de facto arrest. (Zamora Aff. ¶ 4, Ex. 3 p. 6) As stated above, he was not "ordered" to the MP Station, but instead was asked to go there and give information. (Zamora Aff. ¶ 2, Ex. 1).

The United States does not concede the Defendant was under investigatory detention. However, a review of case law on the issue of de facto custody shows the Defendant was never in custody up to the point that he refused to leave the MP Station.

The Ninth Circuit has held that "although there is no bright line for determining when an investigatory stop becomes an arrest, 'a distinction may be drawn at the point of transporting the defendant to the police station." Sepulveda v. Hawn, 2002 U.S. Dist. LEXIS 11373, 40-41 (D. Cal. 2002), *quoting* United States v. Parr, 843 F.2d 1228, 1231 (9th Cir. 1988); *see also* Dunaway v. New York, 442 U.S. 200, 2216, 99 S. Ct. 2248, 2258, 60 L. Ed. 2d 824 (1979) (arrest occurs when suspect is seized and transported to the police station for interrogation); United States v. Hernandez, 825 F.2d 846, 851 (5th Cir. 1987) *cert. den.* (removal of suspect from scene of the stop to police headquarters usually marks the point at which the investigative stop becomes a de facto arrest); United States v. Ceballos, 812 F.2d 42, 49 (2d Cir. 1987) (transporting suspect to police station exceeds bounds of Terry stop and becomes an unlawful arrest); United States v. Gonzalez, 763 F.2d 1127, 1133 (10th Cir. 1985) (forcing suspect to go to the police station crosses the line into de facto arrest).

The facts in the present case are distinguishable from the cited cases above because the Defendant was not compelled to go to the MP Station. He was not transported by the military police, but instead asked to go there to give information and allowed to show up on his own accord. These facts do not rise to the level of an arrest as contemplated by the Courts above.

Further, the Ninth Circuit has also held "[T]he compelled movement of a detainee does not elevate the seizure to the level of arrest in all cases." Sepulveda *supra* at 40-41. The United States Supreme Court has held consistently that moving from one location to another is often justified and does not convert an investigatory stop to an arrest. "There are undoubtedly reasons of safety and security that would justify moving a suspect from

one location to another during an investigatory detention." <u>Florida v. Royer</u>, 460 U.S. 491, 504, 103 S. Ct. 1319, 1328 (1983). "In general, officers may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo' so the limited purpose of the stop may be achieved." <u>United States v. Jones</u>, 759 F.2d 633, 636-37 (8th Cir. 1985), *quoting* <u>United States v. Hensley</u>, 469 U.S. 221, 235, 105 S. Ct. 675, 684, 83 L. Ed. 2d 604 (1985).

In <u>Baron</u>, the Ninth Circuit developed the principle that police may move a suspect without exceeding the bounds of a <u>Terry</u> stop: (1) when it is necessary for safety or security reasons; (2) when it is the least intrusive method available to achieve the limited goals of the stop; and (3) when moving the suspect does not make the circumstances of the detention so coercive that detention becomes indistinguishable from an arrest. <u>United States v. Baron</u>, 860 F.2d 911, 915-16 (9th Cir. 1988).

The fight the military police responded to was at 0330 hours in the parking lot of a bar that was full of departing patrons. (Zamora Aff. ¶ 2, Ex. 1) SGT Miller determined that it was most prudent to transport the suspects to the MP Station for processing and ask the witnesses to go there as well so the information could be gathered in a neutral environment. (Zamora Aff. ¶ 3, Ex. 2) The military police had legitimate safety concerns and because of the time, location, and sheer volume of people who had been in the bar that were now crowding into the parking lot. Moving to the MP Station was the least intrusive method to achieve the goal of getting information concerning the fight that had occurred. Allowing the Defendant to appear there, on his own, was not at all coercive.

Upon arriving at the MP Station, the Defendant joined the group of witnesses that were waiting to give statements. After waiting for a few minutes, SGT Templeton took him into an interview room where the Defendant began to complain about the way everyone had been treated. (Id.) When asked, he refused to give a written statement, but he did give his driver's license to SGT Templeton. (Zamora Aff. ¶ 2, Ex. 1) While giving the little information that he did provide, the Defendant continued to be loud and called the military police "little bitches" and told them they did not know how to do their jobs. (Id.) Finally, the Defendant stated he wanted to leave at which point his driver's license was returned and he was allowed to leave. (Zamora Aff. ¶¶ 2-3, Exs. 1 and 2) He exited the MP Station through the back door. (Id.) The Defendant was at the MP station for approximately 30 minutes in total, which was reasonable since the military police were interviewing many people that were involved in the fight and also people who had witnessed the fight. Even if the Court finds there was a de facto arrest, it ended here when the Defendant was released.

Five minutes later, the Defendant reentered the MP Station through the front door where he continued to disrupt the investigation. (Id.) He became loud and told the other witnesses that were waiting to not give that military police any information or names. (Id.) SSG Miller told him to leave the MP Station. (Id.) The Defendant refused to leave without a ride. (Id.) He then became physically intimidating by invading SSG Miller's personal space, assuming a combative stance and raising his fist appearing to ready an attack upon SSG Miller. (Id.) Finally, the Defendant was then apprehended for disorderly conduct in violation of Alaska Stat. § 11.61.110 as assimilated under 18

U.S.C. § 13, a charge which the Defendant does not dispute was supported by probable cause.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests the Court deny the Defendant's motion for an evidentiary hearing.

RESPECTFULLY SUBMITTED this 14th day of July 2006.

EVE C. ZAMORA

s/ Eve C. Zamora
Eve C. Zamora
Special Assistance U. S. Attorney
101 12th Avenue, Room 310
Fairbanks, Alaska 99701
Telephone: (907) 353-6561-6510
Fax: (907) 353-6501
Email: eve.zamora@us.army.mil
MN Bar: 0297859

**CERTIFICATE OF SERVICE**

I certify that on July 14 2006,
a copy of this SUPERCEDING INFORMATION
was served electronically on:

M.J. Haden, Esq.

/s/ Eve C. Zamora