IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                PLAINTIFF,<br>vs.<br><br><br>ADAM M. SNIEGOWSKI,<br><br>                DEFENDANT. | CASE NO. 4:06-CR-00023-JKS-TWH<br><br>REPORT AND RECOMMENDATION RE: DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS OBTAINED IN VIOLATION OF DEFENDANT'S FOURTH AMENDMENT RIGHTS<br>(DOCKET NO. 15) |

      Defendant Adam M. Sniegowski moves to suppress evidence and statements made to the police when he was arrested on September 25, 2004, at Fort Wainwright, Alaska. Defendant alleges that 1) "Mr. Sniegowski's conduct at the Oasis Club fails to provide reasonable suspicion to detain him" and 2) "Mr. Sniegowski was not formally detained, but effectively arrested".

      The Government opposes the defendant's motion at Docket No. 22. On August 4, 2006, a hearing was held and a transcript of those proceedings is at Docket No. 27. Testimony at the hearing was taken from military police officers SGT Templeton, SPC Peterson and SSG Miller. The defendant also testified. This court, having reviewed the defendant's motion, the government's opposition thereto, the testimony of the witnesses and the exhibits appended to the parties' respective briefs, now submits its Report and

1

Recommendation.

## FACTS

### SGT Templeton

On September 25, 2004, at approximately 3:00 a.m. a fight broke out in the parking lot of the Oasis Club located on Fort Wainwright, Alaska. SGT Templeton was ordered to respond to the Oasis Club and, upon arrival, determined the fight was amongst several females. A crowd of onlookers in the parking lot was estimated to be between 50 and 60 people. SGT Templeton observed that a female was crying and had an apparent black eye. Based upon information from the other military police officers present, SGT Templeton ordered that the female be placed in handcuffs and put in a police car. The female was subsequently taken to the Provost Marshall's Office (PMO or MP station) where it was determined that she was the victim. SGT Templeton testified that not long after his arrival at the Oasis Club he made contact with the defendant and the defendant told him his friend was involved in the fight. SGT Templeton testified he knew the defendant had not been involved in the fight. SGT Templeton estimated the total amount of time he spent talking with the defendant in the Oasis parking lot was about five minutes and after an initial conversation with the defendant he "started getting agitated and started jumping around, getting into my face, pointing at me –" (Transcript 15). SGT Templeton testified the defendant began swearing at him and stated: "MP's

didn't know what they were doing, so shut the fuck up." When SGT Templeton asked the defendant to identify himself he refused to do so (Transcript 16). SGT Templeton testified that while he was at the scene and talking to the defendant he observed another MP display her pepper spray to the defendant. SGT Templeton testified that in order to defuse the situation and restore order among the people still in the parking lot: "I asked the people, the witnesses, if they would come to the MP station." (Transcript 17). He said he made this decision because the people present seem to be getting excited and he wanted to move everyone to the MP station because it was a more secure area (Transcript 17). In response to the question "So did you order anybody -- other than your soldiers that worked for you, did you order anybody to the MP station?" SGT Templeton testified "No, I did not." (Transcript 17). SGT Templeton said he asked approximately 30 people to go to the MP station. SGT Templeton testified that "Approximately twenty-five to thirty people" arrived at the MP station (Transcript 20). SGT Templeton testified that not all of the people he asked to go to the MP station went there.

   After the defendant arrived at the MP station, SGT Templeton took him to a separate room to interview him. In the interview room, the defendant was asked his name, where he lived and what happened during the fight. SGT Templeton testified the defendant refused to answer the questions although at one time he provided a

name but SGT Templeton subsequently found out that it was not defendant's correct name (Transcript 21). SGT Templeton did not remember when he received the defendant's personal ID card but recalled that when it was reviewed, the ID card reflected the defendant's correct name. SGT Templeton testified the defendant's ID card was not taken from him in the parking lot at the Oasis Club. SGT Templeton testified the defendant objected to being interviewed at the MP station and after a few minutes, the desk sergeant, SSG Miller, came in to the interview room and released the defendant. SGT Templeton recalled SSG Miller telling the defendant he was free to go. After the defendant was told he was free to leave, SGT Templeton went back to the waiting room where several other people were seated to find another person to interview. By the time SGT Templeton got to the waiting room, the defendant was already there (Transcript 25). While in the waiting room SGT Templeton testified that he overheard SSG Miller asking the defendant to leave. SGT Templeton heard the defendant say he wasn't going to leave until he got a ride. SGT Templeton testified that the defendant was also "telling everybody in the -- the waiting room not to say anything and give the wrong names and stuff like that. And -- and the desk sergeant proceeded to ask -- ask Adam (defendant) to leave several other times." (Transcript 25). While in the waiting room SGT Templeton overheard SSG Miller ask the defendant to leave approximately three to five times and the

defendant was "real fidgety", "he was really excited, he was really upset, really mad. He -- didn't want to take any kind of direction from the MP's." (Transcript 26). SGT Templeton testified "He (defendant) got into the desk sergeant's face and called the desk sergeant a little bitch," and was "Nose to nose" with SSG Miller (Transcript 27). SGT Templeton testified he could tell the defendant wanted to fight. He further testified, "The desk sergeant took two steps back and said apprehend him (defendant) because we're going to arrest him for (indiscernible) conduct." (Transcript 27). SGT Templeton and another military policeman, SPC Herman tried to apprehend the defendant and put handcuffs on him. In the process, the defendant was wrestled to the floor. During the struggle, SGT Templeton was injured and had to report to the hospital emergency room with a sprained right hand. On cross-examination SGT Templeton testified that anytime the defendant had wanted to leave he could have left, "All he had to do was say I'm going to leave, and he could have left." (Transcript 45). SGT Templeton denied that the defendant stated to anyone "several times he wanted to leave" (Transcript 45). SGT Templeton stated it was possible that SSG Miller gave back the defendant his ID card. SGT Templeton also testified on cross-examination that he did not single out the defendant to go to the MP station and instead made the general statement "let's all go down to the MP station" (Transcript 49). On re-direct examination SGT Templeton testified

that he believed that one of the defendant's friends transported the defendant from the Oasis Club parking lot to the MP station. SGT Templeton testified that he did not expect the same obedience from civilians as he does when he issues orders to soldiers. (Transcript 51). SGT Templeton testified that the defendant never stated to him in the Oasis Club parking lot that he wanted to leave. SGT Templeton testified it took approximately ten minutes to drive from the Oasis Club parking lot to the MP station and that it took perhaps five or ten seconds to walk from the waiting room in the MP station to the interview room where SGT Templeton attempted to interview the defendant. (Transcript 54). On recross-examination SGT Templeton testified that only one person at a time is transported in an MP vehicle, that there were approximately fifty to sixty people in the parking lot at the Oasis Club that night and that he wanted all of those people to come to the MP station. He said that only between twenty-five and thirty made it to the MP station and the rest of them "probably went home" (Transcript 58). SGT Templeton testified that on the night in question he probably weighed about 215 pounds, was 6'3", was in uniform and had his sidearm with him.

### SPECIALIST PETERSON

SPC Peterson testified that around 3:00 a.m. on September 25, 2004, she responded to the Oasis Club parking lot because of an ongoing fight. SPC Peterson placed one of the females that had

been allegedly fighting into her patrol vehicle and then walked back to the other MP's near the larger group of people still there. SPC Peterson testified she observed SGT Templeton trying to question the defendant to find out what was going on and the defendant was "kind of rowdy and kind of anxious or rambunctious" (Transcript 64). She said that SGT Templeton was "trying to get him to calm down and relax and take a breath and everything, and he wouldn't." She also testified, "And then at one point in time, he kind of like made fists and held them back like that, and then I did what my levels of force would require me to do from then on." (Transcript 64). SPC Peterson testified, "After I saw him do that and SGT Templeton kept trying to tell him to calm down and relax and he wasn't listening, I drew my OC spray, which is pepper spray, and I pointed it at him, and then I couldn't use it because SGT Templeton was standing right there and because they were so close it would have gotten both of them." (Transcript 68-69). SPC Peterson testified that not everyone was ordered to report to the military police station but that, "If they weren't witnesses but they knew someone, then they had the choice to go to drive them or do whatever once we were done with them, but for the most part definitely all the suspects were required to go and some of the witnesses were." (Transcript 80). SPC Peterson subsequently went to the MP station with the person she put in her patrol car and after the suspect had her rights read to her she was released. SPC

Peterson stated she then went into the patrol room which is next to the waiting room and started helping out other MP's taking statements from other suspects (Transcript 71). She was at the doorway of the waiting room in the MP station when she observed that the defendant "started getting belligerent and going off on everyone, and then getting into the desk sergeant's (SSG Miller's) face" (Transcript 72). SPC Peterson testified, "He (the defendant) turned to the desk sergeant and said something along the lines of fuck you, you're a dickhead, you can't do anything to me anyway 'cause I'm a civilian. And then after that, he just started going off. I don't recall exactly what he said after that." (Transcript 74). SPC Peterson then stated: "I observed SGT Templeton, I believe it was the RTO (Radio Telephone Operator) that night, I'm not sure, and another MP in a scuffle with him, Adam (defendant), and then I ran out and then ended up falling over onto the floor, and I was trying to help hold him (defendant) down so they could put cuffs on 'cause he was fighting all of us." (Transcript 72-73).

### SSG MILLER

SSG Miller testified that on the 25th of September 2004 he was the desk sergeant at the MP station on Fort Wainwright, Alaska. SSG Miller testified, "As a desk sergeant, you are the -- the brain, pretty much like the control portion of -- of all the patrols. Patrols are the eyes and ears, and the desk sergeant is

the main operating system." (Transcript 84). SSG Miller testified that he saw the defendant walk in to the MP station but he wasn't being escorted by any of the MP's and that he believed the reason why the defendant was at the MP station was because he was "maybe a witness" (Transcript 87). SSG Miller observed the defendant leaving the waiting room and going to the back of the MP station to be interviewed. As the MP's were interviewing various witnesses in separate rooms , SSG Miller testified:

> A: I bounced around to each MP to find out what was going on, get their input, and find out what was going on with their -- their possible subjects or witnesses, whoever they had in their possession. SGT Templeton came up to me, stated that he's having problems with Mr. Sniegowski. He stated that Mr. Sniegowski wanted to leave, he wasn't complying with any of the paperwork so I walked back to the back, which is a -- we placed him in the -- in the garage area which had its own little access -- entrance to the PMO and exit to the PMO. When I walked back there, Mr. Sniegowski was a little unruly, didn't want to comply with anything, he wanted to leave, so I told him to leave.
>
> Q: And then what happened?
>
> A: He left the PMO through the back door.
>
> Q: Where were you when he left?
>
> A: Inside the garage.

> Q: Were you alone inside the garage?
>
> A: I was there with SGT Templeton and SPC Wharton. (Transcript 88-89)

SSG Miller testified that after the defendant left he returned to the waiting room and began talking to other people who were still there. He further testified:

> A: I started interviewing them to find out what was going on, what they saw. I asked them if they wanted to make a statement. At that time, Mr. Sniegowksi came walking back in, talked to all three of them, stating to change their -- change the names of the people involved, don't cooperate with MP's, and -- I can't remember what else.
>
> Q: Okay. How much time occurred -- how long -- how long was Mr. Sniegowski in the interview area?
>
> A: I can't recall that, ma'am. Maybe -- maybe ten to fifteen minutes.
>
> Q: How long does it take you to walk from the interview area to the -- the desk?
>
> A: Maybe thirty seconds, ma'am.
>
> Q: Okay. And how much time passed between him leaving and then reentering?
>
> A: Approximately about five minutes, ma'am.
>
> Q: And what did you do when he reentered? What happened?
>
> A: While I was interviewing the three civilians I mentioned

10

    --

Q:    Mm-hmm (affirmative).

A:    -- at that point when I saw Mr. Sniegowski talk to these three, I walked off the desk and came around. There's a door separating the lobby and the -- the rest of the PMO. I opened the door, I mentioned to Mr. Sniegowski that he can't com -- count -- cannot compromise the investigation, you need to leave, at which time he stepped in my personal space, assumed a bladed stance, from there he move to a combat stance, raising his fist, tucking his chin down. To my -- in my thoughts, I though he was going to attack, so I told two patrols to apprehend him. (Transcript 90-91)

SSG Miller testified that the first time he saw the defendant's ID was "prior to him being placed in the D (detention) cell, he was searched, and I had his ID card for paperwork-wise." (Transcript 92). On cross-examination SSG Miller testified that the subjects of the fight were told to go to the PMO and this was not voluntary but that witnesses were asked to come to the PMO station and some didn't and some did (Transcript 93). SSG Miller then testified:

Q:    "And as far as you know, Mr. Sniegowksi was one of the witnesses that was directed to come back."

A:    As far as I know, yes. (Transcript 94)

11

SSG Miller testified that the defendant was at the PMO for approximately twenty minutes before he was apprehended (Transcript 98).

## MR. SNIEGOWSKI

The defendant's sole testimony was that on the night in question he was 5'8" tall and weighed 140 pounds.

## ARGUMENT

### Was the defendant seized in violation of the Fourth Amendment?

The defendant correctly states, "The Fourth Amendment governs all seizures of a person including those involving only a short detention. United State v. Mendenhall, 446 U.S. 544, 551 (1980). An individual "may not be detained even momentarily without reasonable, objective grounds for doing so." Florida v. Royer, 460 U.S. 491 (1983). Under the principles of Terry v. Ohio, 392 U.S. 1 (1968), "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be engaged in criminal activity." United Sates v. Thomas, 863 F.2d 622, 625 (9th Cir.1988) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)."

Here the evidence before this court establishes a number of facts. They are: 1) The defendant was not placed in handcuffs at the Oasis Club parking lot nor was he transported to the PMO in a military vehicle; 2) Many of the people who were asked at the Oasis

Club by the military police to go to the PMO did not do so and left for other locations; 3) There was no convoy established to escort witnesses from the Oasis Club parking lot to the PMO; 4) While at the Oasis Club parking lot the defendant became agitated, boisterous and confronted SGT Templeton and stated "MP's didn't know what they were doing, so shut the fuck up"; 5) The military police knew the defendant was not a participant in the fight that occurred at the Oasis Club parking lot; 6) SGT Templeton weighed 215 pounds and was 6'3" on the day in questions; 7) The defendant was 5'8" and weighed 140 pounds on the day in question; 8) There were a large number of people gathered outside in the parking lot when the military police arrived, as many as fifty or sixty; 9) The military police decided to move their investigation of the fight from the Oasis Club parking lot to the PMO in order to calm down people who were excited and for officer safety; 10) When the defendant arrived at the PMO he was subsequently taken to an interview room and interviewed by SGT Templeton and another MP; 11)  When the defendant refused to cooperate with the military police the desk sergeant in charge, SSG Miller, came into the interview room and told the defendant he was free to leave; 12) The defendant exited the PMO through a side door at the rear of the building after he was told he could leave; 13) After exiting the PMO building the defendant re-entered the building and while in the PMO waiting room he again became boisterous with the military police officers; 14) The defendant was repeatedly told by SSG

Miller to leave the PMO and the defendant repeatedly refused to do so; 15) The defendant was apprehended by several military policemen when he began struggling with the military police; 16) SGT Templeton was injured while attempting to arrest the defendant.

The defendant argues that he was ordered to report to the PMO and that this order amounts to a detention in violation of his Fourth Amendment Rights.  The defendant further argues that even if his seizure was supported by reasonable suspicion "the conduct of the MPs still violated the Fourth Amendment because it exceeded the scope of a mere <u>Terry</u> detention and amounted to an arrest unsupported by probable cause.  Any investigation into criminal activity must be no more intrusive than necessary. <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)."

SGT Templeton, the soldier in charge of the other military policemen at the Oasis Club testified that he did not order the defendant to report to the PMO.  No evidence has been produced to show by a preponderance of the evidence that any other military police officer at the scene ordered the defendant to report to the PMO.  However, SSG Miller, who did not respond to the scene, but stayed at the PMO as the desk sergeant, stated that as far as he knew the defendant was one of the witnesses ordered to go to the PMO.

This court, based upon the evidence produced at the hearing, finds the defendant was not ordered to report to the PMO and that because he was not ordered to go to the PMO, he was free to leave

the area and go about his business as several other people did when they were asked to go to the PMO.

This court finds that the defendant was not transported, handcuffed or otherwise forced to go to the PMO. This court finds the defendant voluntarily went to the PMO.

The evidence shows that when the defendant entered the PMO he was escorted back to an interview room where he was briefly detained and asked questions which he refused to answer. SSG Miller went to the interview room where the defendant was located and told the defendant that he was free to leave. The defendant subsequently left the PMO building and was once again free to go about his business.

This court finds that when the defendant re-entered the PMO he did so voluntarily and when he re-entered the building he was not under the real or apparent control of the military police.

The court finds the defendant was repeatedly told to leave the PMO building by SSG Miller. The defendant refused to comply with SSG Miller's order to leave the PMO building. The defendant subsequently assumed a stance that SSG Miller believed to be personally threatening, whereupon SSG Miller ordered the defendant be arrested. During the struggle to arrest the defendant, SGT Templeton was injured.

Based upon the foregoing, this court finds the defendant was not detained at the Oasis Club parking lot nor was he ordered to report to the PMO. When the defendant arrived at the PMO he was

15

momentarily detained by the military police who interviewed him. When the interview terminated a short time later, the defendant was told he was free to leave the building. The defendant left the building voluntarily.

When the defendant re-entered the building a short time later, he did so voluntarily. The defendant was then repeatedly told to leave the building by SSG Miller. The defendant could have left the building without any consequences had he chosen to do so.

This court finds that none of the defendant's constitutional rights were violated.

Based upon the foregoing this court respectfully recommends that the defendant's Motion to Suppress Evidence and Statements Obtained in Violation of Defendant's Fourth Amendment Rights be denied.

DATED this 30th day of August, 2006, at Fairbanks, Alaska.


    S/TERRANCE W. HALL
    TERRANCE W. HALL
    U.S. Magistrate Judge


Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding or recommendation shall file written objections with the Clerk of U.S. District Court no later than the **close of business, September 5, 2006**. The failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waive the right to contest those findings on appeal. See McCall v. Andrus, 628 F.2d 1185, 1187-89 (9th Cir.1980), cert denied, McCall v. Watt, 450 U.S. 996 (1981). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation. United States v. Howell, 231

F.3d 615 (9th Cir. 2000). There shall be no Response(s) to the objections. The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

**Objections and responses shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection and the points and authorities in support.**

**\*All objections and responses will be immediately forwarded to the trial judge for review and final determination.**

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. See <u>Hilliard v. Kincheloe</u>, 796 F.2d 308 (9th Cir. 1986).